IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATOYA PAMPLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. | |
| | ) | |
| | ) | |
| ILLINOIS DEPATMENT OF | ) | |
| HUMAN SERVICES; ILLINOIS | ) | |
| DEPARTMENT OF CENTRAL | ) | |
| MANAGEMENT SERVICES, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, LaToya Pamplin by her attorney, Jason Han of the Law Offices of Jason Han and complaining of Defendants, Illinois Department of Human Services ("DHS") and Illinois Department of Central Management Services ("CMS") states:

1) This is a civil action to correct unlawful employment practices, and to make whole the Plaintiff, LaToya Pamplin ("Ms. Pamplin"), under the Americans with Disabilities Act of 1990, as Amended, 42 U.S.C. § 12101 *et seq*. ("ADA"),

2) The ADA prohibits discrimination by a covered employer against any employee such as failing to accommodate that employee's request for reasonable accommodation based on that employee's disability, record of disability, or perceived disability.

3) The ADA requires employers to accommodate the disability of an employee including the use of medical leave.

4) The ADA prohibits retaliation for making use of a known right such as a request for accommodation.

5) Ms. Pamplin asserts that all Defendants have: 1) failed to accommodate her disability under the ADA; 2) discriminated against her based on disability by discharging her in violation of the ADA; and 3) retaliated against her by discharging her for requesting an accommodation under the ADA.

## JURISDICTION AND VENUE

6) Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345 and this action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(1) and (3), Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and is further authorized by Title V of the ADAA, 42 U.S.C. § 12203(c), which incorporates by reference the enforcement remedies and procedures available under Section 107(a) of the ADAA, 42 U.S.C. § 12117(a).

7) Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants operate in the Eastern Division of the Northern District of Illinois, Defendants have continuously been a person and an employer within the meaning of 42 U.S.C. §2000e(a) and (b), 29 U.S.C. § 630(a) and (b), 43 P.S. § 954 (a) and (b), and 43 P.S. § 954(a), and a covered employer within the meaning of 29 U.S.C. § 2611(4), and all of the unlawful practices complained of occurred within this District and Division.

## ADMINISTRATIVE PROCEEDINGS

8) Ms. Pamplin has timely complied with prerequisites for administrative exhaustion required for jurisdiction in this Court under the ADA and all conditions precedent to this lawsuit have been performed or otherwise occurred.

9) Ms. Pamplin filed a charge of discrimination against the Defendants in the Equal Employment Opportunity Commission ("EEOC") within 300 days of the actions complained of on May 5, 2016. *See* Exhibit 1.

10) The EEOC closed Ms. Pamplin's charge of discrimination on September 20, 2018. This lawsuit is timely filed within 90 days of the EEOC's closing of Ms. Pamplin's charge. *See* Exhibit 2.

## THE PARTIES

11) At all relevant times, Ms. Pamplin has resided in the West Pullman neighborhood on the far south side of Chicago.

12) At all relevant times, Defendant DHS has employed over 100 employees in several facilities throughout the State of Illinois.

13) At all relevant times, Defendant CMS has employed over 50 employees in several facilities throughout the State of Illinois.

14) DHS operates the Shapiro Developmental Center ("Shapiro" or "Shapiro Center"), a state operated facility for the developmentally disabled in Kankakee, Illinois.

15) CMS sets and enforces employee policies such as medical leave, attendance, tardiness, and a progressive discipline policy for Illinois state agencies such as DHS.

16) Ms. Pamplin worked under CMS' employee policies while employed with DHS.

17) From May 16, 2011 until Ms. Pamplin's discharge on June 29, 2015, she worked on a full-time basis, approximately 30 to 40 hours per week, as a Mental Health Technician Level I at Shapiro for DHS.

18) A Mental Health Technician Level I provides active treatment services for individuals in structured, educational, vocational, and activity programs; observes and interacts in various activities with individuals; documents care, treatment, and progress in an individual's active treatment plan or other designated records; participates in caring for individuals with mental illness or developmental disabilities by providing monitoring and personal care services; and performs light housekeeping duties.

19) Ms. Pamplin suffers from the disability of chronic and acute gastritis, eosinophilic gastroenteritis, erosive esophagitis, gastroesophageal reflux, and erosive gastritis (collectively "GERD").

20) Ms. Pamplin's GERD substantially limited major life activities in that her disability caused severe stomach and digestive issues which necessitated intermittent medical leave.

## FACTUAL BACKGROUND

21) Ms. Pamplin's annual performance evaluations from 2011 until 2015 showed improvement in her performance each year, and demonstrated that she was performing at or above the Defendants' expectations.

22) Defendants' Absenteeism & Tardiness Policy and their collective bargaining agreement with Ms. Pamplin's labor union, AFSCME Council 31, provided for progressive disciplinary actions of up to 12 violations for unauthorized or unexcused absences.

  a. A first violation would result in counseling.

  b. A second violation would result in an oral reprimand.

  c. A third violation would result in a letter of reprimand.

  d. A fourth violation would result in a second letter of reprimand.

  e. A fifth violation would result in a one-day suspension.

  f. A sixth violation would result in a three-day suspension.

  g. A seventh violation would result in a five-day suspension.

  h. An eighth violation would result in a seven-day suspension.

  i. A ninth violation would result in a 10-day suspension.

  j. A tenth violation would result in a 15-day suspension.

  k. An eleventh violation would cause a 20-day suspension.

  l. A twelfth violation would result in a discharge.

23) Ms. Pamplin first violated Defendants' Absenteeism & Tardiness Policy on July 20, 2011 when she arrived to work tardy; she was counseled for this first-time violation on July 26, 2011.

24) Ms. Pamplin's second violation of Defendants' Absenteeism & Tardiness Policy occurred on October 17, 2011 when she arrived to work tardy; she was given an oral reprimand that same day.

25) Ms. Pamplin's third violation of Defendants' Absenteeism & Tardiness Policy occurred on December 5, 2011 when she arrived to work tardy; she was given her first written reprimand for this violation on January 18, 2012.

26) Ms. Pamplin's fourth violation of Defendants' Absenteeism & Tardiness Policy occurred on February 23, 2012 when she arrived to work tardy by eight minutes; she was given a one-day suspension which she served on April 3, 2012.

27) Ms. Pamplin's fifth violation of Defendants' Absenteeism & Tardiness Policy occurred on November 5, 2013 when she missed work that day; she was marked as unexcused for that time and received an oral reprimand the next day on November 6, 2013.

28) By January 2014, Ms. Pamplin's GERD began affecting her; she was experiencing "flare-ups"—symptoms of stomach and digestive pain, vomiting, and diarrhea—and so sought treatment and a diagnosis.

29) On January 18, 2014, Ms. Pamplin experienced a flare-up that caused her to miss work.

30) Ms. Pamplin received a sixth alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on January 18, 2014.

31) On January 23, 2014, Ms. Pamplin experienced a flare-up that caused her to miss work.

32) Ms. Pamplin received a seventh alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on January 23, 2014.

33) On January 30, 2014, Ms. Pamplin sought treatment for her GERD from Dr. Matthew Johnson at the Family Medicine Center at 722 W Maxwell Street in Chicago.

34) Dr. Johnson wrote Ms. Pamplin a note excusing her for missing work from January 18, 2014 to February 5, 2014.

35) Dr. Johnson's note was faxed to Shapiro at 1:40pm on January 31, 2014.

36) On February 6, 2014, Ms. Pamplin still did not feel better due to her GERD so she returned to the Family Medical Center and this time saw Dr. Maria Albright.

37) Dr. Albright wrote Ms. Pamplin a note excusing her for missing work from February 6, 2014 until February 17, 2014.

38) Dr. Albright's note was faxed to Shapiro at 4:26pm on February 6, 2014.

39) Ms. Pamplin received an eighth alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on February 6, 2014.

40) On February 17, 2014, Ms. Pamplin still did not feel better due to her GERD so she sought treatment from Dr. Brian Boulay at the University of Illinois Hospital & Health Sciences System at 840 S Wood Street in Chicago, Illinois.

41) Dr. Boulay wrote Ms. Pamplin a note excusing her for missing work from February 17, 2014 to March 17, 2014.

42) Dr. Boulay's note was faxed to Shapiro at 10:20am on February 18, 2014.

43) Ms. Pamplin received a ninth alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on February 18, 2014.

44) On March 17, 2014, Ms. Pamplin still did not feel better due to her GERD so she saw Dr. Boulay again at the University of Illinois Hospital & Health Sciences System.

45) Dr. Boulay wrote Ms. Pamplin a note excusing her for missing work from March 17, 2014 to April 20, 2014.

46) Dr. Boulay's note was faxed to Shapiro at 3:49pm on March 17, 2014.

47) Defendants determined that the sixth, seventh, eighth, and ninth violations of Defendants' Absenteeism & Tardiness Policy—absences for which Doctors Johnson, Albright, and Boulay had written notes excusing Ms. Pamplin—necessitated the discipline of a seven-day suspension.

48) Defendants served the seven-day suspension to Ms. Pamplin from March 20, 2014 until March 27, 2014.

49) Ms. Pamplin was on medical leave during the seven-day suspension and so would not have worked during March 20, 2014 to March 27, 2014 regardless of Defendants' disciplinary action.

50) The treatment Ms. Pamplin received from Dr. Boulay was effective enough for Ms. Pamplin to return to work on or shortly after April 17, 2014.

51) Ms. Pamplin returned to work on or around April 17, 2014.

52) Ms. Pamplin's tenth alleged violation of Defendants' Absenteeism & Tardiness Policy occurred on November 3, 2014 when she arrived to work tardy; she was counseled for this violation on November 11, 2014.

53) In May of 2015, Ms. Pamplin experienced flare-ups from her GERD.

54) On May 21, 2015, Ms. Pamplin missed work due to a flare-up.

55) Ms. Pamplin received her eleventh alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on May 21, 2015.

56) The next day, on May 22, 2015, Ms. Pamplin was not scheduled to work; instead she went to the University of Illinois at Chicago Medical Center (UIC Hospital) and received treatment from Dr. Kavita Shanker.

57) Dr. Shanker wrote Ms. Pamplin a note excusing her for missing work from May 21, 2015 to May 23, 2015.

58) Ms. Pamplin returned to work on May 23, 2015; she was scheduled to work two shifts that day.

59) The first shift Ms. Pamplin worked was from 6:30am to 3pm.

60) The second shift Ms. Pamplin worked was from 11pm of May 23 to 6:30am of May 24, 2015.

61) Between the first and second shift, Ms. Pamplin drove home to Chicago to rest up and to retrieve Dr. Shanker's note.

62) Ms. Pamplin completed the second shift that went from 11pm of May 23 to 6:30am of May 24, 2015; she was then scheduled to work a second back-to-back shift that same day on May 24 from 6:30am to 3pm.

63) Around 8am on May 24, 2015, Ms. Pamplin's GERD flared-up and she vomited and experienced severe diarrhea.

64) Ms. Pamplin called her sister in Chicago to come and pick her up because she was too ill to continue working.

65) Ms. Pamplin's sister arrived after 11am and helped Ms. Pamplin leave around noon.

66) Before Ms. Pamplin left Shapiro, she left Dr. Shanker's note from May 22, 2015 for a co-worker to submit to Shapiro's HR employees.

67) Ms. Pamplin's sister drove Ms. Pamplin home and, after dropping her off, returned to work while Ms. Pamplin continued to experience the flare-up from her GERD.

68) Ms. Pamplin received her twelfth alleged violation of Defendants' Absenteeism & Tardiness Policy for leaving three hours early before the end of her shift on May 24, 2015.

69) Later that day, while at home Ms. Pamplin realized she needed to go to the hospital so she called an ambulance.

70) When the ambulance arrived, Ms. Pamplin was taken to the emergency room at Metro South Hospital in Blue Island.

71) Metro South Hospital's emergency room treated Ms. Pamplin and then discharged her later that night around 11pm.

72) Ms. Pamplin called Shapiro when she was discharged to inform them she could not return to work the next day.

73) The next day, May 25, 2015, was Memorial Day.

74) Ms. Pamplin wanted to see a doctor on May 25, 2015 but could not because of the Memorial Day Holiday.

75) Ms. Pamplin received her thirteenth alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on May 25, 2015.

76) On May 26, 2015, Ms. Pamplin saw Dr. Johnson again at the Family Medical Center.

77) Dr. Johnson wrote Ms. Pamplin a note excusing her for missing work from May 24, 2015 to June 3, 2015.

78) Dr. Johnson's note was faxed to Shapiro at 12:20pm on May 26, 2015.

79) Ms. Pamplin received her fourteenth alleged violation of Defendants' Absenteeism & Tardiness Policy for missing work on May 26, 2015.

80) Ms. Pamplin returned to work on June 4, 2015 and worked without incident until June 10, 2015.

81) On June 10, 2015, Ms. Pamplin experienced another severe flare-up.

82) A nurse at Shapiro took Ms. Pamplin's vitals and advised her to go to the hospital immediately.

83) Someone at Shapiro called an ambulance for Ms. Pamplin.

84) The ambulance took Ms. Pamplin to the nearby Riverside Medical Center hospital in Kankakee.

85) Ms. Pamplin stayed at Riverside Medical Center from June 10 until June 16, 2015.

86) While Ms. Pamplin was in the hospital, Defendants sent to Ms. Pamplin's home address in Chicago a notice letter of a pre-disciplinary hearing meeting via certified mail.

87) This notice letter was returned to Defendants by the post office on or around June 18, 2015 as "unable to deliver."

88) The notice letter stated that Ms. Pamplin had been charged with the offense of, "Dereliction of duty as evidenced by abuse of time in violation of Shapiro Policy 6/2 'Absenteeism & Tardiness', AFSCME Agreement Affirmative Attendance Policy, and the Illinois DHS Employee Handbook."

89) The notice letter also stated that the pre-disciplinary hearing would be held on June 22, 2015.

90) On June 16, 2015, Ms. Pamplin submitted to DHS a CMS medical form, Authorization for Disability Leave and Return to Work, filled out and signed by Dr. Sana Mohsin of Riverside Medical Center.

91) Dr. Mohsin's writing on the Authorization for Disability Leave and Return to Work form provided that Ms. Pamplin could return to work on June 23, 2015.

92) On that same day, Shapiro Human Resources Representative, Kimberly Parks, faxed to Riverside Medical Center a letter addressed to a "Dr. Sin" requesting someone at Riverside Medical Center validate that Ms. Pamplin's CMS Authorization for Disability Leave and Return to Work was truly authorized or written by "Dr. Sin."

93) Subsequently, a registered nurse at Riverside Medical Center faxed back a response addressed to Kimberly Parks that Dr. Sana Mohsin had indeed authored Ms. Pamplin's CMS Authorization for Disability Leave and Return to Work form.

94) DHS created a Personnel Receipt for Medical Leave of Absence that acknowledged that Ms. Pamplin was to be on leave until June 23, 2015.

95) On June 22, 2015, at the Shapiro Center, Defendants' agents and employees conducted their pre-disciplinary hearing to levy violations of Defendants' Absenteeism & Tardiness Policy against her.

96) Ms. Pamplin never received notice of this June 22 hearing and so she did not attend.

97) The result of the June 22 hearing was to suspend Ms. Pamplin for 30 days pending discharge.

98) On July 29, 2015, Ms. Pamplin was discharged allegedly for cause.

99) Defendants claim Ms. Pamplin violated Defendants' Absenteeism & Tardiness Policy as the "cause" of her discharge.

100) Because of Defendants' discriminatory actions, Ms. Pamplin was unemployed for eight-and-a-half months.

101) Defendants have not allowed Ms. Pamplin to return to work nor have they offered her another position.

102) Ms. Pamplin eventually obtained employment after searching diligently for eight-and-a-half months.

### COUNT I: AMERICANS WITH DISABILITIES ACT
### FAILURE TO ACCOMMODATE (DHS)

103) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 102.

104) DHS inflexibly applied its Absenteeism & Tardiness Policy in a manner that resulted in denials of Ms. Pamplin's reasonable accommodation requests for medical leave.

105) DHS also failed to accommodate Ms. Pamplin's reasonable accommodation requests by ignoring several of the requests.

### COUNT II: AMERICANS WITH DISABILITIES ACT
### DISCRIMINATION (DHS)

106) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 105.

107) DHS intentionally discriminated against Ms. Pamplin by inflexibly applying their Absenteeism & Tardiness Policy.

108) DHS also intentionally discriminated against Ms. Pamplin by discharging her because of her disability.

### COUNT III: AMERICANS WITH DISABILITIES ACT RETALIATION (DHS)

109) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 108.

110) DHS retaliated against Ms. Pamplin by discharging her for making use of a known right under the ADA, that being requesting a reasonable accommodation for medical leave to treat her disability.

### COUNT IV: AMERICANS WITH DISABILITIES ACT FAILURE TO ACCOMMODATE (CMS)

111) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 110.

112) CMS inflexibly applied its Absenteeism & Tardiness Policy in a manner that resulted in denials of Ms. Pamplin's reasonable accommodation requests for medical leave.

113) CMS also failed to accommodate Ms. Pamplin's reasonable accommodation requests by ignoring several of the requests.

### COUNT V: AMERICANS WITH DISABILITIES ACT DISCRIMINATION (CMS)

114) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 113.

115) CMS intentionally discriminated against Ms. Pamplin by inflexibly applying their Absenteeism & Tardiness Policy.

116) CMS also intentionally discriminated against Ms. Pamplin by discharging her because of her disability.

### COUNT VI: AMERICANS WITH DISABILITIES ACT RETALIATION (CMS)

117) Ms. Pamplin incorporates by reference each allegation of paragraph 1 through 116.

118) CMS retaliated against Ms. Pamplin by discharging her for making use of a known right under the ADA, that being requesting a reasonable accommodation for medical leave to treat her disability.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, LaToya Pamplin, prays this Court enter a judgment:

A. Declaring Defendants' actions and practices violated the ADA.

B. Enjoining Defendants from engaging in actions or practices that discriminate against any employee or job applicant because of their disability, perceived disability, or their participation in this action;

C. Directing Defendants to make Plaintiff whole by providing her back pay, front pay, and reimbursement for all lost benefits;

D. Directing Defendants to pay Plaintiff compensatory damages for emotional distress caused by Defendants;

E. Directing Defendants to pay Plaintiff punitive damages sufficient to punish and deter continuation of Defendants' unlawful employment practices;

F. Awarding Plaintiff reasonable attorney's fees and costs; and

G. Awarding Plaintiff such other relief as this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

By: /s/Jason Han
Jason Han, Attorney for LaToya Pamplin

Jason Han
The Law Offices of Jason Han
208 S Jefferson St. Ste. 204
Chicago, IL 60661
Tel. (872) 201-0088
Fax. (872) 228-9569
Jason@JasonHanLaw.com